Filed 8/19/14 De Edwards v. Escrow of the West CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SHARON DE EDWARDS, | B249503 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC453397) |
| v. | |
| ESCROW OF THE WEST et al., | |
| Defendants and Respondents. | |

　　　　APPEAL from a judgment of the Superior Court of Los Angeles County, John L. Segal, Judge. Affirmed.

　　　　Roni Rotholz; Santiago & Jones and David G. Jones for Plaintiff and Appellant.

　　　　Krishel Law Offices and Daniel L. Krishel for Defendants and Respondents.

_____

Appellant Sharon de Edwards (appellant) and her husband Fernando Edwards (Edwards) brought suit against respondent Escrow of the West (EOTW), the escrow company that handled the refinance of appellant's home in 2006, and against its agent, respondent Clif Young. At the time of the refinance, appellant and Edwards owed a substantial amount in back taxes to the Internal Revenue Service (IRS) and the IRS had recorded multiple liens against the property. Appellant and Edwards essentially claimed that respondents breached their fiduciary duty and failed to follow escrow instructions by failing to ensure payment of all of the IRS liens that had been recorded against the property and by withholding information concerning the existence of unpaid liens. The trial court, acting as trier of fact, found by "overwhelming" evidence that (1) appellant and Edwards were aware of the liens and understood that not all would be paid off through escrow when the loan was secured; (2) respondents followed the escrow instructions by obtaining a lender's title insurance policy from Alliance Title Company (Alliance Title) that provided protection against the existence of liens not appearing on the preliminary title report; and (3) appellant and Edwards failed to establish causation for their claimed damages because the court found not credible their testimony that they would have refused the loan and sold the house if they had known of the liens. Appellant, in a procedurally deficient and incoherent brief, contends the trial court erred in making the first two findings. She also attempts to raise new theories -- legal and factual -- that were not raised below. We reject appellant's attempt to interject new issues on appeal. In addition, we agree with the trial court that the evidence to support the judgment was overwhelming. Moreover, as appellant does not challenge the court's finding on causation, there would be no basis for reversal even were we to agree the other findings were erroneous or unsupported. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Background Facts*

In July 2006, with their existing home loan in default, appellant and her husband refinanced their home.[1] Maurice Charley, an employee of Meridian Capital, Inc., (Meridian Capital) was their loan broker. Bridgelock Capital was the lender. The loan was in the amount of $1.519 million. Respondent Young was the officer who handled the escrow on behalf of his employer, respondent EOTW. Alliance Title provided title insurance.

In April 2006, while the loan was in escrow, Alliance Title prepared a preliminary title report that showed two IRS liens on the property: one in the amount of $12,841 dated December 9, 2003, and another in the amount of $7,748 dated June 28, 2004.[2] The report stated that Alliance Title was prepared to issue a policy of title insurance insuring against any loss which might be sustained by reason of any defect, lien or encumbrance not shown on the report.[3] The IRS

---

[1]  When the refinancing commenced, the home was in the name of appellant only; Edwards's name was put on the title after the refinance. Appellant and Edwards were also involved in litigation with the IRS over many years of unpaid taxes, going back to 1995.

[2]  All of the dollar figures involved in the matter included cents, which we have dropped for the sake of simplicity.

[3]  As numerous courts have explained, it is unreasonable to expect a preliminary title report to list all liens or other matters of public record regarding the subject property. (See, e.g., *Siegel v. Fidelity Nat. Title Ins. Co.* (1996) 46 Cal.App.4th 1181, 1191 ["The records pertaining to real property are complex and encumbrances may be missed by even the most thorough search."]; *Fidelity National Title Ins. Co. v. Miller* (1989) 215 Cal.App.3d 1163, 1175 [title insurer "'may choose to ignore or omit a possible exception to title based on an underwriting decision.'"].) Accordingly, the title insurer agrees to protect against the possibility that liens and encumbrances not disclosed in the preliminary report exist by issuing a title policy insuring against the existence of such liens, and "[t]he prospective insured reasonably concludes a transaction in reliance not on the preliminary report, but on the anticipated policy of title insurance." (*Southland Title Corp. v. Superior Court* (1991) 231 Cal.App.3d 530, 537.)

3

submitted a demand to escrow for the two liens, seeking $64,052.[4] Escrow closed on July 31, 2006. Respondents issued a final report showing the debt owed the prior lender had been paid, as had the two IRS liens totaling $64,052 and other less significant liens. Appellant and Edwards received the final report, the balance of the loan funds as a cash payout of $185,546, and another payment of $8,800.

In June 2006, while escrow was pending, a different title insurer, Land America Commonwealth (also known as Commonwealth Land Title Company, hereafter "Commonwealth"), prepared a preliminary title report which was provided to Young. The Commonwealth report listed three additional IRS liens that had not appeared on the Alliance Title report: a May 14, 1997 lien for $65,674, an October 13, 2003 lien for $17,136, and an August 30, 2005 lien for $146,974. After receiving the conflicting reports, at the recommendation of appellant and the Edwards's loan broker Charley, the lender decided to use Alliance Title rather than Commonwealth as the title insurer on the loan. Alliance Title issued a lender's title insurance policy.

In 2007, appellant and Edwards sought to refinance again. At that time, their mortgage was again in default and the IRS was imposing substantial levies on their income. In 2007, the IRS submitted a payoff demand for $459,849 for all remaining liens, including penalties and interest. Appellant and Edwards did not complete the refinance or sell their home, and ultimately lost it to foreclosure.

B. *Underlying Complaint*

On June 24, 2010, appellant and Edwards filed a complaint against respondents Young, EOTW and Alliance Title. The operative third amended

---

[4] By the time of the demand, interest and penalties had substantially increased the balance.

complaint (TAC) added Meridian Capital (Charley's employer) as a defendant and alleged that the defendants as a whole conspired to "conceal, suppress, misrepresent and exclude" the three recorded IRS liens that had appeared on the Commonwealth preliminary title report but not on the Alliance Title report, "choosing to pay only the smallest recorded tax liens of $64,052 . . . ." It further alleged that the defendants "orchestrated" the exclusion of the three liens in order to "deceive [appellant and Edwards] into believing that the total amount of the recorded federal tax liens on [the] home was $64,052[], so as to conceal, misrepresent and suppress the true total amount of the recorded federal tax liens on [the home] . . . to induce [appellant and Edwards] to accept the loan." Appellant and Edwards claimed that if they had been aware IRS recorded tax liens were being left unpaid, they would "have not accepted the loan, and would have sold their home to pay the IRS recorded tax liens."

The TAC asserted a claim against Alliance Title and Meridian Capital for fraud.[5] The sole claims asserted against respondents were for breach of fiduciary duty and negligent infliction of emotional distress. The TAC alleged that respondents breached their fiduciary duty by "failing to exercise reasonable skill and diligence in carrying out the [e]scrow [i]nstructions," by failing to record Bridgelock's first deed of trust in the first lien position, and by failing to obtain appellant and Edwards's written approval before "agreeing with the other parties['] unilateral decision to exclude IRS recorded tax liens from escrow." It was also alleged that respondents "received conflicting escrow instructions" and failed to resolve the conflict prior to the closing.

---

[5]     Alliance Title and Meridian Capital defaulted.

5

C. *Evidence at Trial*

### 1. *Appellant and Edwards's Knowledge of the IRS Liens*

The case was tried to the court. The primary factual issues contested by the parties were: (1) whether appellant and Edwards were aware of the existence and continued viability of the additional IRS tax liens that did not appear on Alliance Title's preliminary title report; (2) whether, if they had been aware of the liens, they would have insisted that they be paid prior to the close of escrow or, alternatively, would have refused the loan; and (3) whether they ever indicated to respondents that escrow should not close unless all IRS tax liens were paid, irrespective of whether they appeared on the Alliance Title preliminary title report. Appellant testified that she was unaware of any unpaid IRS liens, but that her husband handled all financial matters for their household, and that she had never been in communication with any of the parties or entities involved in the refinance. Edwards denied knowing about any liens having been excluded from payment and testified that he would not have agreed to the loan had he known. During cross-examination, respondents introduced an excerpt from Edwards's deposition in which he admitted receiving copies of the three pertinent IRS liens (the liens appearing on the Commonwealth preliminary title report but not the Alliance Title report) prior to the close of escrow as an attachment to a July 2006 facsimile transmission from his loan broker Charley.[6]

Appellant and Edwards's loan broker Charley initially testified he had told respondent Young that appellant and Edwards wanted all liens recorded against the

---

[6] On cross-examination, respondents' counsel read into the record deposition testimony of appellant and Edwards claiming that they would have sold the house in 2006 had they known of the additional IRS liens, but admitting they did not attempt to sell the house in 2007 when the IRS asserted that approximately $450,000 was still owed. They claimed to believe the IRS dispute could be resolved through bankruptcy.

home to be paid, and that all liens of record were to be included in the escrow. He later retracted that statement, saying he did not recall a specific conversation. In addition, he acknowledged sending two emails to Young, reflecting the contrary position, viz., that *only* liens required to be paid by the lender and Alliance Title should be paid. The first stated that Charley wanted copies of everything that "needs to [be] paid to close." In addition, a few days before the closing, Charley wrote an email to Young, stating: "If it[']s not on his prelim [referring to the Alliance Title preliminary title report], we are not required to pay it in a refi[nance]. . . . [¶] I've never heard of an escrow company wanting to pay all collecti[o]ns and liens even if the liens are not recorded on the title. Especially [if] the lender is not requir[i]ng it."

Young testified that he had communicated primarily with Charley, the loan broker, about the Commonwealth preliminary title report and the additional liens appearing on it.[7] Charley did not instruct Young to pay the liens appearing on the Commonwealth report or indicate that appellant and Edwards desired the payment of such liens. Young testified he spoke with Edwards about satisfying the IRS demands, and that Edwards said whatever was reflected in the Alliance Title report should be paid.[8] Young did not recall a specific discussion with Edwards about

---

[7]    Entered into evidence was an email from Young to Charley dated July 28, 2006 with scanned copies of the $146,974 lien and the $17,136 lien attached.

[8]    Counsel for appellant read into the record deposition testimony in which Young responded "I believe so, yes" when asked "[D]id Mr. Edwards ever tell you that he will pay anything you can show him as long as it's recorded against the property[?]" At trial, he testified he was referring to items reflected in the Alliance Title preliminary title report; he denied having been told to pay every tax lien irrespective of its presence on the report. In deposition testimony read into the record by respondents, Edwards testified that other than documents sent by EOTW to him and appellant approximately one week before the close, neither he nor appellant ever spoke to or corresponded with anyone connected with EOTW.

7

additional liens appearing on the Commonwealth report, but from Edwards's communications of which Young was aware, he believed that Edwards wanted only those liens required by the lender and Alliance Title for closing to be paid.[9] In August 2006, immediately after the closing, Young sent a final closing statement to appellant and Edwards showing that only the two IRS liens appearing on the Alliance Title report had been paid. Neither appellant nor Edwards contacted him to question why other liens had not been paid.

The evidence also established that in May 2006, R.C. Temme Corporation (Temme), a lender to whom Charley shopped the loan prior to selecting Bridgelock, had sent appellant and Edwards a good faith estimate of closing costs, stating that the IRS held a lien of $146,974.[10] On June 13, 2006, Edwards wrote Temme stating that appellant declined to have payments made to the IRS on this lien.

## 2. *Respondents' Compliance with Escrow Instructions*

The primary legal issue at trial was whether Young and EOTW had complied with the escrow instructions.[11] The general escrow instructions stated:

---

[9]    For example, on July 28, 2006, Edwards sent a letter to Alliance Title stating: "[W]e have agreed to pay the IRS' written demand submitted to escrow. It is our positions [sic] that the referenced lien[s] . . . have already been paid, or that if not paid are barred by statute. Our acquiescence to pay the liens is not an agreement that the liens are valid . . . ."

[10]    Appellant's brief discusses at length a preliminary title report prepared by Chicago Title Company for Temme on May 8, 2006, showing a half dozen IRS tax liens, including two IRS liens not found on either of the other reports. There was no evidence that EOTW or Young was aware of this report and no testimony concerning the report at trial.

[11]    During argument on a defense motion for judgment under Code of Civil Procedure section 631.8, counsel for appellant and Edwards stated that the claim against respondents was limited to failure to follow the written escrow instructions. Counsel

*(Fn. continued on next page.)*

8

"The undersigned Borrower(s) [are] obtaining a loan on the property hereinafter described and will cause Lender to hand you . . . proceeds . . . in the amount of $1,519,000, less Lender's normal costs and charges, which you are authorized to use on or before [date left blank,] providing upon recordation of the securing Deed of Trust, you obtain an ALTA Lender's Policy of title insurance, per Lender's requirement covering [the subject] real property . . . ."  The title insurance policy, subject to certain exceptions, was to be "free of encumbrances."  The escrow agent was authorized "to pay any encumbrance necessary to place the title in the condition called for . . . ."

In addition, a set of specific closing instructions was prepared.  The specific instructions stated under the heading "Title Insurance Requirements":  [¶] . . . [¶] "Title Policy must contain the following endorsements (or their equivalents):  [¶] [] ALTA Title Policy must be free from liens, encumbrances, easements, encroachments and other title matters except (i) the lien of our loan in the amount of our loan on the property described herein . . . ; (ii) general, specific, state, county, city, school or other taxes and assessments not yet due or payable:  [¶] (iii) other items as permitted by us; and (iv) the . . . items as shown on the preliminary title report, commitment, binder or equivalent dated June 27, 2006."[12] The specific closing instructions indicated under the heading "payoff requirements" that EOTW was to pay the prior lender, the two IRS liens uncovered in the Alliance Title search, and some other minor non-IRS liens uncovered by Alliance Title.

---

agreed with the court that plaintiffs were not alleging that respondents "went below the standard of care applicable for an escrow agent in California."

[12]   June 27, 2006 was the date of Alliance Title's final preliminary title report.

The specific instructions also stated: "You are authorized to use funds for the account of the Borrowers and to record all instruments when you comply with the following: [¶] 1. This loan must record in *1st* lien position on or prior to the disbursement date noted above." (Italics added.) Edwards testified that when he received a copy of these instructions for his and appellant's signatures, the term "TBD" appeared before the words "lien position"; Edwards whited out "TBD" and typed in the word "1st." He and appellant then signed the specific instructions and sent them back without telling anyone he had made the change.

Young testified that the two IRS liens reflected in the Alliance Title preliminary title report were paid before escrow closed. The final closing statement introduced into evidence also reflected that they had been paid. Respondents called as an expert witness David Alan Shean, who had been the escrow officer for thousands of escrows. He expressed the opinion that respondents had complied with the provisions of the escrow instructions by obtaining an ALTA lender's policy of title insurance in accordance with the lender's instructions, and by paying the liens required to place the title in the condition necessary for Alliance Title to issue the policy.

D. *Trial Court's Decision*[13]

The trial court found that appellant and Edwards failed to meet their burden of proof on their claim for breach of fiduciary duty. First, the court found that "plaintiffs knew of the existence of all of the tax liens on their property . . . , and knew that not all of the tax liens would be paid from escrow as part of the

---

[13]     In their motion for judgment under Code of Civil Procedure section 631.8, respondents contended the claim for negligent infliction of emotional distress was barred by the statute of limitations. Appellant's counsel presented no argument in opposition, and the court granted the defense motion.

Bridgelock refinance." The court found the evidence "overwhelming" that "plaintiffs not only knew that not all of the tax liens would be satisfied by the funds in escrow, but intentionally sought to close escrow with the satisfaction of as few tax liens as possible, leaving more cash available for distribution to plaintiffs, and leaving plaintiffs to continue fighting with the IRS over the validity and amounts of the remaining tax liens." The court concluded that "[t]he lender's decision to accept, and loan the money based on, a title report from Alliance . . . that did not include all of the tax liens plaintiffs admittedly knew about, gave plaintiffs everything they wanted." In support of this finding, the court specifically cited Young's testimony that Edwards said he wanted escrow to pay tax liens "'of record,'" meaning "on the title report," the evidence that Edwards objected to payment of certain of the tax liens, and the evidence that even after receiving the final closing documents, Edwards did not question why all the liens had not been paid. The court found that Edwards's testimony was "not credible," and that his explanations for inconsistencies in his testimony "showed that [he was] still, at least in his mind, fighting with [the] IRS over liens he now claims he did not know would not be paid from the Bridgelock refinancing escrow."

Second, the court found that "the evidence shows that [respondents] complied with all of the terms of the escrow instructions, the amendment to the escrow instructions, and the closing instructions." The court found the testimony of David Shean, respondents' expert witness, was "credible and unrebutted."

Third, the court found that plaintiffs failed to meet their burden of proof with respect to causation: "Plaintiffs' damages arising out of the loss of their home, if any, were caused by plaintiffs' failure to pay their mortgage and their failure to pay their taxes, not by anything [respondents] did or failed to do. At no time did plaintiffs ever sell their home to pay off the tax liens, even after they admit they knew that certain tax liens remained after the Bridgelock refinancing. The

11

evidence showed that plaintiffs are not really the type of people who pay their taxes, let alone sell their home to do so." "[T]hey never sold their home, or even seriously considered it because Mr. Edwards always believed that he would prevail over the IRS and would not have to pay the tax liens." In short, "plaintiffs were gambling that Mr. Edwards could prevail in plaintiffs' tax disputes with the IRS and invalidate the tax liens plaintiffs admittedly knew about, chose to receive more cash [out of] the refinance by not paying off those liens he thought he could invalidate or perhaps reduce, lost that gamble, and is now trying to cover his loss by blaming third parties who did nothing wrong." Judgment was entered and this appeal followed.

## DISCUSSION

A. *Appellant's Brief Fails to Comply with Fundamental Principles of Appellate Jurisprudence*

An appellant's opening brief is required to provide a summary of the significant facts and include citations to the record for all statements in the brief, whether factual or procedural. (Cal. Rules of Court, rule 8.204(a)(1)(C) & (a)(2)(C); Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2009) ¶ 9:36, p. 9-11 (rev. #1, 2009) & ¶ 9:126, p. 9-36 (rev. #1, 2006).) In addition, "[a] party who challenges the sufficiency of the evidence to support a finding must set forth, discuss, and analyze all the evidence on that point, both favorable and unfavorable." (*Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218.) "When appellant's opening brief states only the favorable facts, ignoring evidence favorable to respondent, the appellate court may treat the substantial evidence issues as waived and presume the record contains evidence to sustain every finding of fact." (Eisenberg, et al., *supra*, 8:71, p. 8-34 (rev. #1, 2009).)

12

The statement of facts in appellant's opening brief fails to comply with these basic requirements. It purports to summarize certain documentary evidence and selected emails, but makes no attempt to present a coherent account of the evidence presented at trial. The discussion portion of the brief is a similarly selective assemblage of assertions and arguments, often without citation to the record or legal authority. On this basis alone, we could deem appellant's arguments forfeited.[14]

B. *The Trial Court's Factual Findings, Supported by Substantial Evidence, Demonstrated that There Was No Breach of the Escrow Instructions*

Appellant's challenge to the judgment below also fails on the merits.[15] First, ample evidence supported the trial court's factual determination that appellant and Edwards were aware when the loan closed of additional IRS liens other than those

---

[14] Despite these deficiencies, we decline to grant respondents' motion for monetary sanctions. The appeal does not appear to be entirely "frivolous," "taken solely for delay," or to be "totally and completely without merit," the standards under which sanctions are available on appeal. (Code Civ. Proc., § 907; Cal. Rules of Court, rule 8.276(a); *In re Reno* (2012) 55 Cal.4th 428, 513; *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650.) Moreover, respondents' brief is not without defects. They state, for example, that Edwards "made the stunning concession that he never had any viable legal claim to begin with, and therefore, left his wife to pursue this appeal." On the pages cited, Edwards acknowledged that he was not on the title of the subject home until the loan closed. The court asked for argument addressing whether this fact affected his ability to assert a separate claim for damages, but made no ruling that his absence from the title prior to the closing precluded him from asserting his claim.

[15] Appellant suggests that the standard of review for all issues raised is de novo. A trial court's factual findings are reviewed for substantial evidence. (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.) Where interpretation of a contract requires introduction of extrinsic evidence and resolution of credibility, the trial court's construction is also reviewed for substantial evidence. (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955.)

13

set forth in the Alliance Title preliminary title report, and did not want the loan proceeds to be used to pay off any IRS liens that did not have to be paid to secure the loan. Appellant cites Young's testimony that Edwards said he wanted all liens "of record" paid. She ignores, however, Young's explanation that by "of record" he meant appearing on the Alliance Title report.[16] Further, she ignores the emails from Charley to Young, indicating Charley, appellant's agent, was fully aware that IRS liens other than those listed on the Alliance Title report existed, and making clear that only those items appearing on the report and required to be paid in order to close should be paid.[17] Finally, appellant ignores the correspondence from Edwards stating that he objected to payment of the $146,974 lien and was agreeing to pay the two liens appearing on the Alliance Title report only under protest.

Similarly, appellant failed to demonstrate a breach of the escrow instructions. Appellant's contention that the written escrow instructions required "paying all tax liens that [were] due and delinquent" is incorrect. As there is no guarantee that a preliminary title report prepared in advance of a real estate financing agreement will reveal all liens or encumbrances of record (see fn. 3, *ante*), escrow instructions do not customarily require that all liens of record be paid before escrow closes, or that the property be transferred free of encumbrances. Nor did they do so here. The form escrow instructions provided that prior to disbursing the $1.519 million in loan funds, EOTW would "obtain an ALTA Lender's Policy of title insurance, per Lender's requirements" covering the subject property, and that "[t]*he policy* . . . be free of encumbrances." (Italics added.) The

---

[16]     The trial court specifically found that the term "'of record'" as used by Young referred to liens "on the title report" that the lender "require[ed] . . . to be paid."

[17]     A loan broker is the agent of the borrowers. (*Smith v. Home Loan Funding, Inc.* (2011) 192 Cal.App.4th 1331, 1335; *Winnett v. Roberts* (1986) 179 Cal.App.3d 909, 919.)

14

specific closing instructions similarly provided that EOTW would obtain an "ALTA policy . . . free from liens, encumbrances, easements, encroachments and other title matters . . . ." Alliance Title stated in the report that it would issue a title policy insuring against any loss which might be sustained by reason of any defect, lien or encumbrance not shown on its preliminary title report. In obtaining such policy EOTW thus complied with the escrow instructions.

In short, the escrow instructions required respondents to ensure that a lender's title insurance policy free of exceptions be in place. Payment of the two liens listed in Alliance Title's preliminary title report ensured that Alliance Title would issue such policy. Accordingly, the trial court's finding that respondents complied with the escrow instructions is supported by our independent review of the evidence and interpretation of the escrow instructions. (See *Siegel v. Fidelity Nat. Title Ins. Co.*, *supra*, 46 Cal.App.4th at p. 1194 ["""""[[I]t is generally held that no liability attaches to the escrow holder for his failure to do something not required by the terms of the escrow or for a loss incurred while obediently following his escrow instructions. [Citations.]"""""].)[18]

Appellant attempts to raise several arguments on appeal that either were not raised below or are refuted by the evidence at trial. First, appellant suggests the IRS's 2006 $64,052 demand was not satisfied. This is a new theory of liability not raised below and contradicts appellant's own judicial admission that this amount

---

[18] Appellant contends that Edwards's undisclosed amendment of the closing instructions to state that the Bridgelock loan should be recorded in the "1st" lien position somehow required respondents to pay all liens or transfer the property free of all encumbrances. In the absence of reasoned argument or legal authority to support this contention, it is forfeited. Moreover, as Edwards conceded, he made the change unilaterally and without notifying respondents. His undisclosed, unilateral change could not bind respondents. (See *Angus v. London* (1949) 92 Cal.App.2d 282, 284-285 [deleting a term added to escrow instructions by buyer without the knowledge of the seller did not result in binding agreement].)

15

was paid.  In addition, unrebutted evidence at trial, including Young's testimony, established that it was paid.  Second, appellant contends that respondents should be deemed jointly and severally liable with Alliance Title.  There was no issue raised at trial concerning Alliance Title's liability, if any, and no theory presented that respondents were engaged in a conspiracy or joint venture with that company.  Third, appellant contends that the July 2006 facsimile transmission from Charley to Edwards attaching copies of the three additional liens uncovered by Commonwealth was fabricated by respondents, and that the actual transmission sent to Edwards that day included only the IRS demand for the two liens included in the Alliance Title report.  The record reflects that the document, including the attachments, was presented to Edwards for authentication at his deposition and at trial.  He admitted receiving it in the form presented to him; at no point did he or his counsel suggest that it had been altered.[19]  Fourth, appellant attempts to revive her claim for negligent infliction of emotional distress, raising various factual scenarios to support her contention that it was timely asserted when the original complaint was filed.[20]  When respondents moved for judgment on the pleadings on the ground this claim was time-barred, appellant's counsel presented no argument in opposition, essentially conceding the point.  It is axiomatic that an appellant may not raise on appeal matters that were not litigated below and may not assert positions contradictory to those taken at trial.  (See Eisenberg, et al., *supra*,

---

[19]    Contrary to appellant's claim that this document was "very prejudicial" to appellant, the trial court did not mention it in its statement of decision.  In making the findings concerning the understanding of the parties, the court stated it relied on Young's testimony, Edwards's objection to payment of the two liens appearing on the Alliance Title report, and the evidence concerning Charley's communications with Young.

[20]    The closing occurred in June 2006.  The complaint was filed four years later, in June 2010.  Claims for negligent infliction of emotional distress are subject to a two-year statute of limitations.  (Code Civ. Proc., § 335.1; see *Pugliese v. Superior Court* (2007) 146 Cal.App.4th 1444, 1450.)

16

¶ 8:229, p. 8-155 (rev. #1, 2009) ["[A]ppealing parties must adhere to the theory (or theories) on which their cases were tried."].)

Finally, even were we to find the trial court's determinations concerning appellant's and Edwards's knowledge and its interpretation of the escrow instructions deficient in any respect (which we do not), there would be no basis for reversal. The judgment was independently supported by the finding that appellant and Edwards failed to prove causation by demonstrating that any losses they suffered resulted from anything respondents did or failed to do. Specifically, appellant and Edwards's claim that had they known of the additional IRS liens, they would have foregone refinancing and sold their house to pay off the liens was conclusively refuted by the evidence at trial. Edwards acknowledged that more than a year after the refinancing, when the home was worth $2.5 million and Edwards was admittedly aware of the remaining IRS liens, he and appellant chose not to sell the home and pay off the liens, but to declare bankruptcy instead. In finding a lack of causation, the trial court justifiably relied on the uncontroverted evidence that the couple allowed delinquent taxes to accumulate for many years, made no effort to sell even after the IRS imposed levies against their income following the refinancing, and continued to dispute their tax liability for years thereafter. In short, independent of the court's factual findings -- amply supported by the record -- the evidence demonstrated a lack of causation fatal to appellant's claims.

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.
The motion for sanctions is denied.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MANELLA, J.

We concur:

WILLHITE, Acting P. J.

EDMON, J.*

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.